# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 12, 2015

## TWAIN DEMARIO VAUGHN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2004-D-3057     Mark Fishburn, Judge**

---

### No. M2014-01924-CCA-R3-PC – Filed November 12, 2015

---

A Davidson County jury convicted the Petitioner, Twain Demario Vaughn, of one count of reckless homicide, one count of first-degree felony murder, one count of aggravated robbery, and two counts of attempted aggravated robbery. The trial court merged the reckless homicide conviction with the felony murder conviction and sentenced the Petitioner to an effective sentence of life in prison. This Court affirmed his convictions and sentence on appeal. *State v. Twain Demario Vaughn*, No. M2006-01659-CCA-R3-CD, 2008 WL 110094, at *1 (Tenn. Crim. App., at Nashville, Jan. 9, 2008), *no Tenn. R. App. P. 11 application filed*. The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. The post-conviction court dismissed the petition as time barred. It then reversed its ruling, appointed counsel, and held a hearing after which it dismissed the Petitioner's petition. On appeal, the Petitioner contends that the post-conviction court erred because his trial counsel was ineffective for failing to: (1) introduce the victim's toxicology report; (2) request more time to review videotaped statements that called into question the eye witnesses' credibility; and (3) have the Petitioner's competency evaluated. After review, we conclude that the Petitioner's petition was not filed within the statute of limitations and that he has not shown a statutory or due process ground for the tolling of the statute of limitations. As such, we dismiss the petition as time barred.

### Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed

ROBERT W. WEDEMEYER, J. delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ. joined.

Loren E. Pardue, Nashville, Tennessee, for the appellant, Twain Demario Vaughn.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Glenn Funk, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## I. Facts
### A. Trial

This case arises from a robbery and shooting in Nashville. This Court summarized the evidence presented against the Petitioner at trial as follows:

> Kandice Regina Smith testified she lived in North Carolina, and she came to Nashville in July 2004 to see her brother, Kris Carlyle, the victim, along with her mother, Kathy Smith, and her boyfriend, Paul Puckett. The night of July 7, 2004, the four of them drove around the city "sightseeing" in Smith's mother's two-door Chrysler Lebaron. Smith's mother drove, Carlyle sat in the front passenger seat, Smith sat behind her mother, and Puckett sat behind Carlyle.

> Smith testified they found themselves lost, and they stopped because four young black men walked into the road. Carlyle rolled down his window to attempt to ask for directions, and the young men instructed them to pull off the road. They pulled the car into the parking lot of a vacant restaurant, and three of the young men walked up to the car. Smith testified that, suddenly, the fourth man "c[a]me out of nowhere and put a gun in the car and demanded our money." Carlyle gave the man ten dollars. Smith described the gun as a dark revolver. Smith stated, "Then he pointed the gun at my boyfriend and asked him for his money and he told him he didn't have any. Then he pointed the gun at me and asked me for my money and I told him I didn't have any, and then he turned back and pointed the gun at my brother and shot him" once in the neck. The other three young men did not participate in the robbery or say anything to the passengers.

> The car sped away, and the group eventually found a hospital. The police arrived at the hospital where they discussed the situation. Later that night, the passengers and the police returned to the location of the shooting to search for evidence. Two days later, Smith met with Detective Coleman, who presented her with a photo lineup. She identified the [Petitioner] as the shooter from the pictures. Smith testified that none of the other three young men appeared to have a weapon.

> On cross-examination, Smith explained that they arrived at the vacant lot because they turned off the main road in order to ask directions. They first met Detective Coleman at the hospital, they took him to the

crime scene, and they then went to the station to be interviewed. Smith admitted that the shooter may have been wearing red, and, when pressed about the shooter's hair style, Smith stated, "you could braid it [–] it looked like, it just wasn't done." Additionally, Smith told Detective Coleman there appeared to be a young man with "cornrows" who first approached the car.

Paul Nelson Puckett, Jr., testified to the same background information as Smith. Specifically, he stated they were driving on a "fairly big road" towards downtown Nashville. As they were driving, there were "[j]ust four people, just, basically, making their way across the road, and we had to basically either stop or run over them." Carlyle was going to ask for directions, but the young men motioned for the car to pull off the road. Puckett described everything as happening very quickly. There were four young black men, and three of the young men walked up to Carlyle's side of the car. Then, the fourth man walked up and "put[ ] a gun through the window and demand[ed] some money." Carlyle gave the man ten dollars. After getting money from Carlyle, the man demanded money from Puckett and Smith, and he then turned and shot Carlyle.

They sped off and ultimately found someone to lead them to a hospital. Carlyle did not talk during the short trip to the hospital. Later, Puckett met with Detective Coleman and reviewed photographs of individuals in a line-up format. Puckett picked out two individuals, one being the [Petitioner] and the other an unassociated individual. In court, Puckett identified the [Petitioner] as the shooter.

On cross-examination, Puckett explained he could not remember if he told Detective Coleman that the [Petitioner] was the shooter when he was interviewed. After reviewing a tape of the interview outside the presence of the jury, Puckett admitted that he did not positively identify the [Petitioner] as the shooter during the initial interview. In further describing the shooter, Puckett stated that the shooter wore red, had "cornrows," was the tallest, and looked the oldest. On redirect-examination, Puckett stated that the [Petitioner's] hair was different in court than when he first identified the [Petitioner].

Kathy Smith, the victim's mother, testified that Carlyle was an aspiring singer/songwriter living in the Nashville metropolitan area when he was killed. On the night in question, the group was driving downtown so Carlyle could sing and play his guitar. Kathy Smith stated that they

3

found themselves lost and saw a "perfect opportunity to stop and ask for directions" when they saw four young men in the road. Carlyle rolled down his window when the young men motioned the car to pull off the road to get out of traffic. Three of the young men approached the car and then the fourth man approached. The first three did not appear to be armed, but the fourth man pointed a revolver at Carlyle and demanded money. Carlyle gave the man ten dollars, but the other occupants of the car did not have any money. He then pointed the gun at Carlyle and shot once. Kathy Smith testified that she could not identify the shooter because she could not see his face from where she was sitting.

Kathy Smith testified that they asked Carlyle if he had been hit, and, when he turned, blood "gushed" from his mouth; he could not speak. They found someone to lead them to the hospital, but Kathy Smith believed her son died during the car ride to the hospital.

On cross-examination, Kathy Smith testified that she did not recall telling an officer at the hospital that the three young men approached the car with "small plastic bags." She stated that they were traveling downtown for Carlyle to play his guitar on the corner for money. She also again admitted that she could not identify the shooter.

DeEarl Huddleston testified that he was seventeen years old and was familiar with the First Avenue and Lafayette Street area in Nashville. Huddleston stated that, on July 7, 2004, he was in that area with three friends, Ja Marable, Ta Marable, and the [Petitioner]. They were walking from Lafayette Street to their neighborhood when they saw the automobile in which the victim was riding. Huddleston testified that they were about to cross the street when the individuals "stopped and asked if we had any drugs to sell them." Huddleston did not recall specifically which person asked for the drugs, but Huddleston asked them, "what kind of drugs?" They said they did not care, and, because Huddleston had marijuana, the car pulled into the Mr. Burger vacant parking lot. The individuals in the car purchased marijuana from one of the other individuals, Ja Marable, and Huddleston moved to walk away from the transaction.

Huddleston testified that he heard the [Petitioner] say "set it out," a phrase that is commonly used in the context of a robbery. He then heard the [Petitioner] fire a shot into the car. The four young men then ran from the scene. Huddleston testified that the gun was a black .38 Special and that neither he nor Ja Marable or Ta Marable had a weapon. They were not

4

aware that the [Petitioner] was going to rob and shoot the passengers in the car.

Huddleston further testified that Rosalyn Blakely is his aunt, his mother's sister. Huddleston stated that, after the shooting, he went home and discussed the situation with his mother and Blakely. They took Huddleston to Detective Coleman the next day, and Huddleston gave the detective the name "Ty" because he did not know the [Petitioner's] real name.

On cross-examination, Huddleston admitted that he previously testified that the [Petitioner] was wearing a black shirt. Huddleston also admitted that he was selling drugs that night, and his mother made him go to the police. Huddleston stated that he had convictions in juvenile court of theft and attempted theft. When questioned about their relative heights, Huddleston stated that he was the tallest, Ta Marable the second tallest, then the [Petitioner], and Ja Marable the shortest. Huddleston admitted that he had been friends with the Marable brothers for some time, and after the shooting the three of them again met up that night to "hang out."

Officer Claude W. Mann testified that he was "working radar" at Fourth and Lafayatte in Nashville when he stopped a truck. As he was talking to the individuals in the truck, a woman, Rosalyn Blakely, who Officer Mann knew from working the area, yelled at him. Blakely said that she wanted to tell him about something that had been worrying her: she had information about the shooting of the victim in this case. Officer Mann called for a detective, Todd Watson, who arrived and talked with Blakely.

Jacarlvis ("Ja") Marable testified that he was thirteen years old. He stated that he was with his brother, Ta, DeEarl Huddleston, and the [Petitioner] the night of July 7, 2004. They were proceeding home when they crossed Lafayette Avenue. A car stopped because the four of them were in the road, and someone from the car yelled at them to move. Someone from the car also asked the young men whether they had drugs, and the car then pulled into the Mr. Burger parking lot. Huddleston and the [Petitioner] first approached the car, but Ja Marable and Ta Marable did not immediately approach the car because their cousin, Neecy Marable, called to them. The route to Neecy Marable's house took them past the car stopped at the Mr. Burger. They stopped briefly at the car and saw Huddleston hand the passengers marijuana.

5

Ja Marable then testified that he saw the [Petitioner] pull out a gun, and he heard Huddleston say, "give me everything." Marable said, "the car tried to pull off, and the gunshot went off, I don't know if the car hit the gun and made the gunshot go off or he pulled the trigger or whatever, I don't know, it was either one." Marable stated that he knew he and his brother did not have a weapon, but he did not know whether Huddleston had one. After the shooting, Marable and his brother went one direction and Huddleston and the [Petitioner] went another. Marable testified he spoke with Detective Coleman the next day. At that time, he was shown a picture line-up, and Marable identified the [Petitioner] as the shooter.

On cross-examination, Marable testified that the [Petitioner] was wearing a black shirt. Marable's brother, Ta, had his hair half braided, half out, because "he was taking it down." Marable affirmed that he did not sell any drugs and that Huddleston was part of the robbery.

Detective Hugh Coleman testified that he was first contacted about a shooting around midnight on July 7, 2004. He responded to Centennial Hospital where he found the victim already deceased. He interviewed the other passengers in the early morning hours of July 8, and then, accompanied by Paul Puckett and Kandice Smith, he found the crime scene. The next day, July 9, 2004, a patrol officer was flagged down and told of a witness, DeEarl Huddleston. After interviewing Huddleston, they interviewed Ja Marable who identified the [Petitioner] from a picture line-up. Next, Candace Smith also identified the [Petitioner] from a photo line-up. Paul Puckett was shown a line-up, and he identified two possible individuals, one being the [Petitioner]. Kathy Smith was unable to identify anyone.

Detective Coleman testified that the [Petitioner] and his parents arrived at the criminal justice center in order to meet with him on July 9. The [Petitioner's] mother requested an attorney, so Detective Coleman did not question him that night. Detective Coleman did talk with the [Petitioner's] mother about the process. At some point in the discussion, Detective Coleman began to describe what he had heard about the incident. Detective Coleman stated that the car pulled up and asked, "Do you have anything for me?" Detective Coleman testified that the [Petitioner] then sat up and excitedly said, "Yes, he did, that's what he said."

Detective Coleman testified that he interviewed Ta Marable on July 12 but that he ultimately determined that none of the other three young men

6

would be charged with a crime. He believed that none of the three knew the [Petitioner] had a weapon or that they participated in the robbery. Detective Coleman admitted that he did not create a photo line-up with any of the other three young men in it. Detective Coleman stated that the police never recovered a weapon.

On cross-examination, Detective Coleman testified that Paul Puckett told him, in his interview four hours after the shooting, that the shooter was the tallest of the group and wore a red shirt. Puckett also told Detective Coleman that the shooter had braids and the gun was black with a brown handle. Detective Coleman stated he did not prepare a line-up with pictures of individuals with braids because he did not have a picture of the [Petitioner] in braids. Additionally, he admitted he did not prepare a line-up for the victim's family members with any of the other three young men in it. Although he was not totally sure, Detective Coleman agreed that Ja Marable was probably the shortest, and Huddleston and Ta Marable were the tallest of the group.

Detective Coleman testified that, during the course of the investigation, he came across the name "Danesa Nelson" as the person to whose house the Marable brothers went after the shooting. Detective Coleman admitted he did not attempt to locate or interview Nelson. Detective Coleman testified that one could see the interstate from the Mr. Burger parking lot. He admitted that there was no physical evidence linking the [Petitioner] to the shooting, and the young men likely discussed the shooting at some point after it occurred.

Dr. Staci Turner testified that she performed the autopsy on the victim in this case. The victim died from a gunshot wound that entered his neck and proceeded through his chest cavity, a normally fatal wound. Based on the nature of the wound, Dr. Turner stated that the gun was approximately one to three feet away from the victim when it was fired. Because Dr. Turner found blood in the victim's lungs, she determined he lived a short time after he was shot.

On cross-examination, Dr. Turner testified that it would be possible for gunshot residue to get on the shooter. From the angle of the entry wound, it appeared that the shooter was standing when the shot was fired.

*Vaughn*, 2008 WL 110094, at *1-5.

Based upon this evidence, the jury convicted the Petitioner of one count of reckless homicide, one count of felony murder, one count of aggravated robbery, and two counts of attempted aggravated robbery. The trial court merged the reckless homicide conviction with the felony murder conviction, and the trial court sentenced the Petitioner to life in prison for the felony murder conviction, with all the other sentences running concurrently with that sentence. On appeal, this Court affirmed the Petitioner's convictions and sentence. *Id.* at *10.

## B. Post-Conviction

The Petitioner filed a petition for post-conviction relief alleging that the prosecution failed to disclose favorable evidence, namely video-taped interviews. He further alleged that the trial court interfered with his right to present a defense by not allowing him to introduce the victim's toxicology. Finally, he asserted he received the ineffective assistance of counsel because his trial counsel ("Counsel") failed to promptly interview the Petitioner or witnesses and failed to call witnesses favorable to his defense. The post-conviction court initially dismissed the petition as time barred, but, after reconsidering, the post-conviction court appointed the Petitioner an attorney, who filed an amended petition. Relevant to this appeal, the amended petition alleged that Counsel was ineffective because she failed to properly investigate the case or prepare for trial. The amended petition further alleged that the Petitioner's trial counsel failed to obtain and review videotaped statements, and failed to investigate the case. The State filed a response asking the post-conviction court to dismiss the petition as time-barred and arguing that the petition was without merit.

The post-conviction court held a hearing during which the following evidence was presented: The Petitioner testified that he was convicted of this felony murder offense when he was fifteen years old. He said that he had only completed the sixth grade in school and that he did not understand the legal process at the time of his trial. The Petitioner said that, around the time of his trial, he thought that he had a good relationship with Counsel. He said, however, that Counsel only came to see him three or four times during the time that he was incarcerated awaiting trial.

The Petitioner testified that, two days before trial, the State offered to allow him to plead guilty in exchange for a twenty-year sentence. The Petitioner said he did not discuss this offer in depth with Counsel because he felt "like [he] was innocent."

The Petitioner said that Counsel did not ask him about his school history, his academic background, and she did not have him mentally evaluated for any type of diminished capacity. The Petitioner said that he did not know that he had the right to review the discovery in his case, and he never reviewed the discovery before trial. He

said that he and Counsel never discussed individuals named James Simpson, Bryan Britton, Derrick Speller, Reggie Owens, "Cardell," or a man whose nickname was "Chicago." The Petitioner said that his discussions with Counsel centered around his transfer from juvenile court to criminal court where he would be tried as an adult.

During cross-examination, the Petitioner testified that Counsel represented him while this case was in juvenile court. He said that in juvenile court at the detention hearing and at his transfer hearing, Ja Marable and another witness testified against him. He agreed that their testimony at his trial comported with their previous testimony. The Petitioner clarified that the State offered him a sentence of twenty years in exchange for a guilty plea after his trial had already begun. He said that Counsel explained to him that he would be required to serve seventeen or eighteen years, and he told her to decline the State's offer. He said he declined the offer because he was innocent.

The Petitioner said that he heard the proof at trial that the three surviving passengers in the car identified him as the man who had brandished a weapon, asked for everyone's money, and then shot the victim in the neck. The Petitioner conceded that there were two additional witnesses who testified that they were with the Petitioner and that he was the one who had robbed and killed the victim.

The Petitioner contended that Counsel should have presented a "better argument." When asked what the jury should have been told that Counsel did not tell them, the Petitioner responded "I don't know."

Upon questioning by the post-conviction court, the Petitioner testified that Counsel informed him that if he did not accept the twenty-year plea offer he potentially faced a life sentence in prison.

Counsel testified that she represented the Petitioner at the juvenile preliminary hearing and also at the transfer hearing. Counsel said that she received several tape recordings of interviews shortly before trial. She said that the recordings were from interviews of witnesses to the robbery and shooting. Counsel said that she filed a motion for new trial on the basis that the State had committed a *Brady* violation by not disclosing them sooner, and the Petitioner's case was appealed on this issue. Counsel said that the Court of Criminal Appeals did not reverse on this ground, but she still felt that the late-received discovery prejudiced her representation of the Petitioner.

Counsel said that she was familiar with the Petitioner's school history. He had been expelled from public school and placed in an alternative school. His enrollment was later terminated from the alternative school for excessive absences. Counsel said that she

believed that she had the Petitioner's competency evaluated in juvenile court, which was why she did not have him re-evaluated in adult criminal court.

Counsel testified that she had an investigator appointed to assist her in representing the Petitioner. The investigator located witnesses and took video recordings and photographs of the scene. Counsel said that the investigator investigated all of the witnesses interviewed by the police, including a prostitute who said that a "James Simpson" had something to do with this murder. Some of the witnesses were difficult to find, including a "Reggie Owens" who was in Chicago. The investigator was unable to speak with Mr. Owens.

Counsel said that she did not call any witnesses on the Petitioner's behalf. Counsel said that two of the State's witnesses, Ja Marabel and Ta Marabel, were brothers and that they knew each other better than they knew the Petitioner. She did not, however, interview them personally before trial, relying instead on their testimony from the juvenile transfer hearing.

Counsel said she explained the State's offer to the Petitioner. She said that he was only fifteen years old at the time and that she was concerned that he could not appreciate the difference between twenty years and life in prison.

During cross-examination, Counsel testified that she had been an attorney for thirteen years and that she had represented clients in juvenile court before when she worked for the public defender's office. She was in private practice at the time that she represented the Petitioner. Counsel said that another attorney, Jeff Powell, assisted her in trying the case but that she was lead counsel. Counsel recalled that she met with the Petitioner "a lot." She said that it was more than three or four times.

Counsel said that she and the Petitioner always had a "good relationship." She said that the Petitioner knew the testimony the State intended to present at trial because he had attended the juvenile transfer hearing where those witnesses testified. Counsel said that she did not think that the Petitioner had a competency issue. She said she could discuss the case and the consequences of a conviction with him. She saw no indication that he was insane.

Counsel said that the Petitioner had always maintained his innocence.

Counsel testified about the video recordings that she did not receive until shortly before trial. She said that the State took the position that the recordings were not *Brady* material but were *Jencks* material, so the State was not obligated to provide the recordings until trial. This Court, on appeal, held that the recordings were not *Brady*

10

material. The Court also stated that Counsel had thoroughly cross-examined the witnesses about the statements contained in the recordings.

On redirect examination, Counsel testified that her theory of defense was that the Petitioner did not have the gun and, therefore, could not have pulled the trigger. She chose to convey that theory through cross-examination of the State's witnesses.

Based upon this evidence, the post-conviction court dismissed the petition. In its written order, the post-conviction court found the following:

> A review [of] the record in this case leads the court to conclude that the Petitioner is unable to establish either prong necessary to the granting of post-conviction relief. Although the [the Petitioner] alludes to his youth as reason[ ] to suggest that [Counsel] was deficient, he presents no evidence that his youth in any manner hampered him in understanding the nature of the proceedings against [him] or his ability to effectively communicate with [C]ounsel. In fact, both he and [Counsel] agree that they were able to communicate throughout the pendency of the case. The only dispute centered on the limited amount of information communicated, not the inability to comprehend the import of what was being communicated. The court accepts the testimony of [Counsel] that she fully discussed with [the Petitioner] the contents of discovery and the strategy that would be employed at trial and which was mutually agreed upon. Finally, [the] Petitioner failed to present any evidence suggesting he suffered from any mental or emotional deficiency that would support a claim of incompetency, insanity or diminished capacity. Therefore, he has failed to meet his burden on this issue since the court is not allowed to speculate as to what the results of a forensic evaluation may have shown. *See generally Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

> Likewise, Petitioner has presented no evidence that [Counsel] was deficient in her performance for failing to obtain the services of an eyewitness identification expert or that the services of such an expert would have resulted in a different outcome. Moreover, the law in Tennessee at the time of the trial of this case did not allowed for State funds to retain the services of such an expert. *See State v, Coley*, 32 S.W.3d 831 (Tenn. 2000). It was not until 2007 that the Supreme Court reversed *Coley*. *See State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007).

> The court accredits the testimony of [Counsel] that she was prepared to cross examine . . . any of the three (3) persons with [the Petitioner] at the

time of the incident and that she, through her investigator, was unable to develop anyone else as a viable suspect. As to the first issue, [the] Petitioner suggests nothing in the testimony of his cohorts that was a surprise. He does not suggest there was any[] line of attack that [Counsel] might have employed in cross examination that was not pursued. He simply offers nothing to show what [Counsel] failed to do in questioning these eyewitnesses. Similarly, the Petitioner offers nothing to support his implication that there were other viable suspects who could have committed these crimes. [Counsel] and her investigator attempted to pursue this avenue, but could not locate any of them or develop any reliable evidence to tie any of them to the crimes. [The] Petitioner has done nothing to advance this proposition either.

Finally, although the court inexplicabl[y] overruled itself by finding the statute of limitations was not applicable, the court cannot find any factual basis to support this reversal from its initial position. It is the court's thoughts that the reversal was intended to allow the attorney to investigate whether there was due process grounds to suspend the application of the limitations period not to actually find that the limitations period should be suspended. It is only for the confusion created by the court that the court has considered the merits of [the] Petitioner's claim.

Based on the foregoing, the court finds that each of the grounds raised in support of [the] Petitioner's claim of ineffective assistance of counsel is without merit and should be DENIED.

It is from that judgment that he now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because his trial counsel was ineffective for failing to: (1) introduce the victim's toxicology report; (2) request more time to review some videotaped statements that called into question the eye witnesses' credibility; and (3) have the Petitioner's competency evaluated. The State contends that these arguments are either waived or meritless or both.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). A petition for post-conviction relief must be filed within one year of the date on which the judgment became final if no direct appeal was

taken. T.C.A. § 40-30-102 (a).  Our Legislature emphasized the fact that "[t]ime is of the essence of the right to file a petition for post-conviction relief," and provided only three narrow exceptions to the statute of limitations: (1) a new constitutional right with retrospective application; (2) new scientific evidence establishing actual innocence; and (3) the invalidation of convictions underlying an enhanced sentence. T.C.A. § 40-30-102 (b).

The constitutional right to due process, however, may necessitate tolling the statute of limitations in certain circumstances outside of the enumerated statutory exceptions.  *See Seals v. State*, 23 S.W.3d 272 (Tenn. 2000); *Burford v. State*, 845 S.W.2d 204 (Tenn. 1992).  Our Supreme Court has held:

> [B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that a potential litigant be provided an opportunity for "presentation of claims at a meaningful time and in a meaningful manner."  The test is "whether the time period provides an applicant a reasonable opportunity to have the claimed issue heard and determined."

*Seals*, 23 S.W.3d at 277-78 (quoting *Burford*, 845 S.W.2d at 207).  "[A] post-conviction petitioner is entitled to due process tolling of the one-year statute of limitations upon a showing (1) that he or she has been pursuing his or her rights diligently, and (2) that some extraordinary circumstance stood in his or her way and prevented timely filing." *Bush v. State*, 428 S.W.3d 1, 22 (Tenn. 2014) (citing *Whitehead v. State*, 402 S.W.3d 615, 631 (Tenn. 2013)).  Thus far, our Supreme Court has identified only three instances in which due process requires tolling of the post-conviction statute of limitations: (1) where the basis for post-conviction relief arises after the statute of limitations has expired; (2) where a petitioner's mental incompetence prevented compliance with the statute of limitations; and (3) where attorney misconduct prevents compliance with the statute of limitations.  *Whitehead*, 402 S.W.3d at 623-24 (Tenn. 2013).  "Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Smith v. State*, 357 S.W.3d 322, 355 (Tenn. 2011) (quoting *Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010)).

In this case, the conviction became final thirty days after the Defendant's convictions were affirmed on appeal, January 9, 2008.  The Petitioner did not file his

petition until April 7, 2009, almost two months past the one year statute of limitations period.

A post-conviction petitioner must prove compliance with the statute of limitations to be entitled to post-conviction relief because the post-conviction statute of limitations is a jurisdictional requirement for the courts of Tennessee. *See* T.C.A. § 40-30-102 (a) ("[T]he one-year limitations period is an element of the right to file the [post-conviction] action and is a condition upon its exercise."); T.C.A. § 40-30-102 (b) ("No court shall have jurisdiction to consider a petition filed after the expiration of the limitations period . . . ."); Tenn. Sup.Ct. R. 28, § 4(B); *Nix*, 40 S.W.3d at 464 (noting that "the one-year statutory period is an element of the right to file a post-conviction petition and . . . it is not an affirmative defense that must be asserted by the State"). Indeed, because failure to comply with the statute of limitations precludes jurisdiction, courts have a duty to ensure that the post-conviction statute of limitations is satisfied and must dismiss a post-conviction petition on this basis sua sponte if necessary. T.C.A. § 40-30-106 (b) ("If it plainly appears . . . that the petition was not filed . . . within the time set forth in the statute of limitations . . ., the judge shall enter an order dismissing the petition."). The Petitioner has not offered any due process basis for tolling the statute of limitations, and we see none. As such, we are constrained to dismiss the Petitioner's petition for post-conviction relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, the appeal is dismissed.

_____
ROBERT W. WEDEMEYER, JUDGE

14